# SUPREME COURT—IN PROBATE.

### IN THE MATTER OF THE WILL OF JOHN ELY, OF KAHUA, HILO.

THE testator being unable to read the will himself, and there being no express proof that it was read over to him, the *onus probandi* is cast upon the proponent of showing that the testator had a knowledge of the contents, from which he may fairly be considered to have discharged himself, upon proof of the due execution of the will and the full capacity of the testator, in the absence of any evidence of undue influence or fraud.

The fact that the writer of the will was himself a large beneficiary under it, over and above the portions bequeathed to the near relatives of the testator, is not singly of itself sufficient to found a presumption of fraud or undue influence ; but it is a circumstance which requires the Court to look narrowly to the evidence.

In such a case the *onus* is upon the contestant to show affirmatively the undue influence or suspicious conduct on the part of the proponent.

Loose declarations or conversations attributed to the testator, to be received with caution, if not distrust.

The judgment of the Court was delivered by Justice ROBERTSON as follows :

This cause comes before the full Court on appeal from the judgment of Justice Robertson, at Chambers, admitting the will propounded to probate.

The will presented was made on the 20th day of October, 1858, three years previous to the death of the testator, which took place under melancholy circumstances in the month of November, 1861.

After careful consideration of the evidence laid before us, we are satisfied that the will was duly executed by Mr. Ely, at a time when he was of sound mind and disposing memory, and that he declared it, or signified it to be his will, in the presence of the subscribing witnesses, and we deem it unnecessary to review the objections raised by counsel for the contestant touching these points.

But on behalf of the contestant, who is the only surviving child and heir at law of Mr. Ely, a further ground of objection to the validity of the will has been raised, namely : That as it is in proof that the testator, who was an illiterate man, was in-

Vol. II. 82

capable of reading the will himself, it is incumbent on the proponent to prove that the will was read over to him by some other person, before the Court can be judicially satisfied that the testator fully understood the contents of the instrument; and that this precaution is rendered more than usually imperative, in this case, from the fact that the proponent, who is a beneficiary to a comparatively large amount under the will, wrote the instrument himself. Indeed, it has been argued by counsel that the peculiar terms of the will and the circumstances under which it was prepared and executed, show that the proponent abused the testator's confidence, with a view to his own aggrandizement.

The document offered for probate reads as follows :

"In the name of God, Amen : I, John Ely, of Kahua, in the District of Hilo, Island of Hawaii, Hawaiian Islands, being of sound mind and memory, do make, publish, and declare, this my last will and testament, in manner following, that is to say :

"*First.*—I give and bequeath to my wife, Naipu, the sum of five hundred dollars, as also I give and devise to her all that real estate belonging to me, and known as Kahua, together with all the hereditaments and appurtenances thereunto belonging, or in any wise appertaining : to be used and enjoyed by her during the term of her natural life ; and from and immediately after her decease, I give and devise the same to my son, Daniel Ely, his heirs and assigns, forever. And in addition to the above, I give and bequeath my wife, Naipu, all the furniture of the house upon said land as it now is, or may be at my decease, together with my horse and four head of cattle.

"*Second.*—I give and bequeath to my son, Daniel Ely, the sum of one thousand five hundred dollars, together with all debts or moneys due me from Hawaiian natives, and all moneys due me from John Nomore, and William Burk, and John Avery Simmons ; as also I give and devise to said son, Daniel Ely, aforesaid, his heirs and assigns, all that tract or parcel of land situate on Kulaimanu, in the District of Hilo, belonging to me, together with all the hereditaments and appurtenances thereunto belonging, or in any wise appertaining, to have and hold the same to the said Daniel Ely, his heirs and assigns forever.

"*Third.*—I give and bequeath to my nieces, Miss Mary

Hughes (daughter of my dear departed sister, Ellen Hughes, of North Wales, Great Britain,) and her sister (name to me unknown,) the sum of two thousand dollars each.

"*Fourth.*—I give and bequeath to my friend Benjamin Pitman, of Piihonua, Hilo, Hawaii, the sum of one thousand dollars. *And lastly.*—I give and bequeath all the rest, residue and remainder, of my personal estate, of what nature or kind soever (after paying the several legacies, and all funeral expenses, debts, dues and demands against me,) to Benjamin Pitman, of Piihonua, Hilo, Hawaii, whom I hereby appoint my executor of this my last will and testament—hereby revoking all former wills by me made.

"In witness whereof, I have hereunto set my hand and seal this, the twentieth day of October, in the year of our Lord one thousand eight hundred and fifty-eight.

(L. S.)    JOHN ELY."

The foregoing instrument was at the date thereof declared to us by John Ely, the testator therein mentioned, to be his last will and testament ; and he at the same time acknowledged to us, and each of us, that he had signed and sealed the same; and we thereupon, at his request, and in his presence, and in the presence of each other, signed our names thereto as attesting witnesses.

GEORGE E. TUCKER.

DON JOSEF SAIVIC.

LO.

GILBERT WALLER.

As a general rule, the will of a person *sui juris,* which is proved to have been executed and attested with sufficient formality to meet the requirements of the law, and to have been made at a time when the testator was a free agent, and possessed of a sufficient mental capacity to make a valid disposition of his property, will be admitted to probate, as a matter of course. The proponent having made proof to the satisfaction of the Court to this extent, has done all that can be required of him, unless the party contestant is enabled to point to some peculiar or unusual circumstances in the case, which render it necessary for the Court to seek for further proof that the testator knew and understood the contents of the will, and intended to dispose of his property in the manner set out in the instrument.

Will of John Ely.

On behalf of the contestant in the present case, it is said there are two facts here which call for the exercise of extraordinary vigilance on the part of the Court, and which ought to be held to constitute of themselves, a conclusive objection to the will being pronounced valid, unless satisfactorily overcome. First, it appears that the testator, who was a Welshman by birth, was unable to read the will himself, and it is not expressly proven to have been read to him ; and, secondly, the proponent, who is also the executor named in the will, is a beneficiary to a considerable amount. This two-fold objection will be most conveniently examined, by reversing the order in which it has been stated, because if it should appear that the large bequest to the proponent was a consequence of anything having the appearance of undue influence, or of conduct calculated to excite any suspicion of fraud, that circumstance would enhance the force of the first part of the objection ; but if the contrary should appear clear in the estimation of the Court, then the first branch of the objection would be entitled to comparatively little weight.

So far as we can gather from the testimony, Mr. Ely was by no means a weak-minded man. Sober, steady, and parsimonious, and possessed, although illiterate, of a sufficient degree of business intelligence to have acquired and preserved a considerable amount of property, which he well understood how to take care of, he was not at all a person likely to be easily coaxed or frightened into making an involuntary disposition of his worldly goods. A short time previous to the execution of the document now before the Court, he had been taken ill, and Dr. Saivic, an Austrian physican, was sent for to attend him. Fearing, apparently, that his illness might terminate fatally, he dispatched his son Daniel to the village of Hilo, a distance of ten miles, with a message for Mr. Pitman to come to him, but without stating for what purpose. The roads were in bad condition, and a delay of two days occurred, as Mr. Pitman had to go to Kahua by sea. When he arrived, Dr. Saivic says the testator was gaining strength—was a good deal better. After a private interview with Mr. Ely, Mr. Pitman inquired of the physician, if the testator was, in his opinion, in a fit condition to make his will, to which the doctor replied in the affirmative. Mr. Pit-

man then said that Mr. Ely desired every one, except himself, to leave the room, as he was about to make his will. In about an hour afterwards, Mr. Pitman came out from the bed-room and asked Dr. Saivic to be a witness to the will, and sent also for Messrs. Tucker and Waller, for the same purpose. When the witnesses entered the bed-room where the testator was lying, they saw there a small table with pens and ink upon it. Mr. Pitman took up from the table the will, which had just been written and was not folded, and informed the witnesses that they had been sent for to attest Mr. Ely's will. Mr. Ely said, " Yes, yes, my will," in his usual quick way. Mr. Pitman then, according to the recollection of the witnesses Tucker and Waller, said he would read the will if Mr. Ely desired it, but he said, " No, no." Mr. Pitman then said to the witnesses that it was not necessary for them to know the contents of the will —they could attest the signature of the testator, and that would do. He then read over the certificate of attestation, and the will was signed by Mr. Ely, and by the four witnesses in his presence. Dr. Saivic testifies that Mr. Ely signified his assent to the will, when Mr. Pitman read the certificate of attestation, but that Mr. Pitman did not offer to read the will itself. The testator's wife, and his son, the contestant, were in or about the house at the time.

These, then, are the circumstances under which this will was executed ; and where, it may be asked, is the evidence of undue influence, or of suspicious conduct, on the part of the proponent? The onus is upon the contestant to show it affirmatively. There is no evidence of a sudden change in the testator's intentions respecting his property, or of a variation from instructions. The proponent did not, when he heard of Mr. Ely's sickness, rush to his bedside and importune him to leave him his property. This is not the case of a mentally weak man overcome by superstitious fears, or by the coercion of a controlling mind. The proponent did not carry with him a will ready prepared, to impose it on the sick man, for it does not appear that he was aware, until he reached Kahua, that the testator desired to make his will. It is in vain to argue that, because the will bequeaths a larger amount of property to the testator's intimate friend, Mr. Pitman, than to his son Daniel,

that therefore undue influence must have been used, unless the Court must assume that any man, however respectable his character, will abuse the confidence of a friend who relies upon him, whenever the opportunity is offered. That a testator should prefer others to his own children is no new thing. It is only a circumstance, in any case, which requires the Court to look narrowly to the evidence. To quote the language of Mr. Surrogate Bradford, of New York, in the case of Weir vs. Fitzgerald, 2 Bradford's Rep., p. 67, " Kind offices and faithful services, in ordinary course, tend to influence the mind in favor of the party thus acting ; and care should be taken not to confound the natural action of the human feelings in this respect, with positive dictation and control exercised over the mind of the testator." The application of this language is emphatically just in the present case.

But there is no express proof that the will was read to the testator, and therefore, says the contestant, it does not appear, affirmatively, that he knew its contents. There can be no question that, in any case like the present, it is extremely desirable and most satisfactory to have such proof, as the best evidence of a knowledge of contents, but there is no conclusion of law which renders that particular mode of proof a *sine qua non.* On this point of knowledge of contents, Dr. Lushington, in Durnell vs. Corfield, 1 Robertson's Ecc. Rep., 51, having referred to the case of Barry vs. Butlin, and speaking in reference to the doctrine in that case, said : " The doctrine is, that proof of the knowledge of the contents may be given in any form ; that the degree of proof depends on the circumstances of each case, that in perfect capacity knowledge of contents may be presumed, but that when the capacity is weakened, and the benefit to the drawer of the will is large, the presumption is weaker, the suspicion is stronger ; the proof must be more stringent, and the Court must be satisfied of the knowledge of the contents beyond the proof of execution by the testator." (1 Jarman on Wills, 44). Mr. Baron Parke, in delivering the judgment of the Appellate Court, in the case of Barry vs. Butlin, in the course of his remarks said : " If, by these expressions the learned Judge (Sir John Nicholl) meant merely to say, that there are cases of wills, prepared by a legatee, so

Will of John Ely.

pregnant with suspicion that they ought to be pronounced against in the absence of evidence in support of them, and that extending to clear proof of the actual knowledge of the contents by the supposed testator ; and that instructions proceeding from him, or the reading of the instrument by or to him, are the most satisfactory evidence of such knowledge, we fully concur in the proposition so understood ; in all probability the learned Judge intended no more than this.  But if the words used are to be construed *strictly ;* if it is intended to be stated as a rule of law, that in every case in which the party preparing the will derives a benefit under it, the *onus probandi* is shifted, and that not only a certain measure, but a particular species of proof is therefore required from the party propounding the will, we feel bound to say that we conceive the doctrine to be incorrect.  The strict meaning of the term *onus probandi* is this, that if no evidence is given by the party on whom the burthen is cast, the issue must be found against him.  In all cases this *onus* is imposed on the party propounding a will ; it is in general discharged by proof of capacity and the fact of execution ; from which the knowledge of and assent to the contents of the instrument are assumed." "All that can be truly said is, that if a person, whether attorney or not, prepares a will with a legacy to himself, it is at most a suspicious circumstance, of more or less weight, according to the facts of each particular case ; in some of no weight at all." (1 Jarman on Wills, 45, note.)  According to the doctrine recognized by these eminent authorities, the proponent in the case before us, having made proof of the due execution of the will and the full capacity of the testator, might, in the absence of any evidence of undue influence or fraud, be fairly considered to have discharged the *onus*, which the law casts upon him.  But the proof on the part of the proponent goes beyond this.  Two of the subscribing witnesses, Messrs. Tucker and Waller, testify that Mr. Pitman offered to read the will in their presence, if desired by the testator, and that he prevented it.  True, the testimony of Dr. Saivic is in conflict with that of the others on this point.  But there are the observation and recollection of two against those of one, all being equally intelligent and disinterested.  And if

Messrs. Tucker and Waller are correct in their remembrancè, then the Court would be warranted in presuming conclusively, that the will had previously been read to the testator—that he well knew its contents, and, as all the testimony renders probable, desired to conceal them from his own family and others. It is in vain to argue that a designing beneficiary might have read the will falsely to the testator, or persuaded him to decline having it read before the witnesses, unless we are bound to believe that virtue and probity have forsaken the earth, or that every man should be esteemed a villain until he shall have proved the reverse. If the recollection of Messrs. Tucker and Waller is to be relied on, then Mr. Pitman was justified in not reading the will in presence of strangers without the testator's assent.

There is another point connected with this part of the case, which was forcibly put by counsel for the proponent, and is, in our opinion, of considerable weight. It is argued that the instrument itself bears intrinsic evidence of having been framed under the immediate dictation of the testator. Else, it is asked, whence the large bequest to his two nieces, in Wales, couched in the peculiar language in which it stands? It cannot be denied that this clause of the will does carry on its face the stamp of honesty and the impress of the testator's own mind, his memory having called up those near and dear to him through a long space of time, to be favorably remembered, now that he was about to make a final disposition of his property. It is incredible that a party whose first object was to aggrandize himself, should have committed the egregious error of inserting so large a bequest to parties occupying only the relation of nieces, and living at so great a distance, when the same amount added to the bequest in favor of Daniel Ely, would have had so clear a tendency to answer the argument so strongly urged against the validity of the will, that its provisions are inconsistent with the natural affection of a father towards his son.

As indicative of the will having been drawn as the instructions fell from the testator's lips, we may notice also, the precise enumeration of the animals bequeathed to his wife ; the specific statement of the names of certain persons who owed him sums of money ; the bequest of the land at Kulaimanu to Daniel, and

the occurrence of a specific legacy to Mr. Pitman, before the residuary bequest. It has been argued that Mr. Pitman must have known, when he wrote the will, that Mr. Ely's title in Kulaimanu was worth little or nothing, and that the bequest of it to Daniel was of no value. But it is clear that Mr. Ely always had enjoyed certain rights there, and Daniel himself has lived on that land, under his father. The testator's estimate of his title appears from the fact that he thought himself in a position to obtain a Royal Patent, on commutation, long after the will was made. He must have thought, therefore, that the bequest of the land to Daniel was valuable.

Great stress has been laid upon certain testimony given by the contestant and Mr. Metcalf, which it is argued, tends to prove that the testator did not know the contents of this instrument. The contestant states that one night shortly after the execution of the will, he overheard a conversation between his father and mother in bed, when the former told the latter that he had left her in his will, some money, and the homestead at Kahua ; that he had bequeathed to Daniel some money, and the land at Kulaimanu, which, Daniel says, he thought was his own; mentioned also the debts due to him by natives and others, which he said he had given to Daniel ; said he had not bequeathed anything to his relatives in Wales, and that he had left the money lying at interest in Mr. Pitman's hands entirely undisposed of, because he might live a considerable time yet and need money for himself, and that specific money would go to somebody after he died.

Now this is a very singular conversation, if correctly reported by the contestant. So far as the testator's statement to his wife goes, it accords with the instrument, except as to the legacy in favor of the two nieces. And it is worthy of remark that he did not reveal the precise amount of money he had given to his wife, or to his son. He did not say that they were to have all his property between them. If that had been his desire, why should he have made a will at all ?  There would have been no propriety in his doing so, unless he had desired to take away from the share to which Daniel would have been entitled by the statute, and increase the share of his wife, a supposition which, in view of the testimony touching their domestic rela-

tions, would be ridiculous on its face. The reason, too, which he assigned for not having disposed of the funds in Mr. Pitman's hands, shows that he merely wished to meet the prying curiosity of Naipu in such a way as would not excite the jealousy and anger she and Daniel would naturally have felt if they had been informed of the real state of the matter. He knew that Naipu was sufficiently ignorant to be imposed on by the idea that if he had disposed of the funds in Mr. Pitman's hands by will, he could not have used any of them afterwards himself; but that Mr. Ely was not so ignorant on the subject as to believe this, is abundantly proven. Again, it may be asked : Can it be believed, in the absence of any apparent cause for such a strange course, that having set about making a testamentary disposition of his estate, he would have left one-half of it unappropriated? The desire of concealment is patent throughout, else why did not the testator invite his son to be present at the preparation of his will? After it was executed, why did he not retain it among his other papers, or place it in the keeping of Daniel, who attended to business for him the last few years of his life? These are pregnant facts to show his wish to conceal the contents from his wife and son.

We deem it unnecessary to refer at length to the conversation which Mr. Metcalf testifies to having had with the testator, after Mr. Pitman had left the Kingdom. We could not have drawn the same inferences from what the testator said that the witness drew. Any weight that might otherwise have been attached to the remarks then made by Mr. Ely, is much detracted from by the way in which they were induced. The following language of Mr. Surrogate Bradford may be cited with propriety in noticing that part of the argument based upon the testator's declarations, as reported by the contestant and Mr. Metcalf : "I know very well how much conversations of this kind are to be distrusted. From motives of policy, for the sake of peace, to secure kindly attention, or from other motives often operating upon the human mind, especially in the case of an artful or wary man; or again, in an unguarded moment, in a spirit of exasperation, or boasting, or threatening, loose declarations are frequently made of testamentary dispositions, contemplated or executed, which are not in harmony with the truth."

(Allen *vs.* the Public Administrator, 1 Bradford's Rep., p. 392.)

There is one incident disclosed by the testimony, which tells strongly in favor of the proponent's good faith, and is worthy of particular notice. About five months previous to the murder of Mr. Ely and his wife, Mr. Pitman left Hilo for Honolulu, on his way to the United States. Before leaving, he placed the will in the keeping of the Rev. Titus Coan, at Hilo, with instructions to deliver it to Mr. Ely if he should call for it. Mr. Ely was informed of the place where the will was deposited, both by Mr. Pitman and Mr. Coan. Now if the instrument had been fraudulently concocted, or if it had contained bequests which the testator never intended, why should the proponent have run the needless and imminent risk of discovery by leaving it behind, when he could as easily have carried it with him? Judging from the testimony, he might have anticipated that the matter would be stirred up after he had gone, either from curiosity or some other motive.

Having thoroughly weighed the voluminous evidence before us, we have no hesitation in saying that, to our apprehension, the instrument presented for probate makes very much such a disposition of the testator's property as it was probable he would make under the circumstances in which he was placed. Keeping in view various facts connected with his domestic relations, affecting both his wife and son, it was not probable, we think, that he would bestow upon either of them a large share of his property. The liberal provision for his nieces is in accordance with the fact that, about three months previously, he had forwarded to Miss Mary Hughes the sum of five hundred dollars, showing that the children of his beloved sister were affectionately remembered by him; and having set apart for the several persons who had claims upon his bounty by relationship the amounts which he considered just, there remained no one upon whom he was so likely to bestow the residue of his estate as Mr. Pitman, his intimate and trusted friend of many years standing, at whose departure from Hawaii he shed tears of genuine grief.

At the hearing before the full Court, counsel for the contestant was understood to say that he did not mean to charge the proponent directly with having fraudulently framed this instru-

ment, contrary to the wishes of the testator, although some parts of his argument conveyed an imputation of fraud, or the exercise of undue influence ; but that he rested the contestation mainly upon the weakness of the evidence of a knowledge of the contents by the testator. This we have always regarded as the turning point in the cause. Sitting here as a Court of Probate, it is our province to pass upon the facts, as well as upon the law involved ; and, putting the question to ourselves, as we would to a jury, whether or not we are satisfied, upon a consideration of all the evidence, that the testator was acquainted with the contents of this instrument, and that they conform to his real intentions, we answer, clearly, that we are satisfied, beyond a reasonable doubt, that the will before us is genuine. The judgment below is therefore affirmed.

Mr. Bates for proponent.

Mr. Harris for contestant.