979 P.2d 39

In the Matter of the ESTATE OF
Carmen Corrine HERBERT,
Deceased.

No. 16291.

Supreme Court of Hawai'i.

March 17, 1999.

As Amended on Denial of
Reconsideration April 15, 1999.

Arthur B. Reinwald, (Michael J. McGuigan, with him on the brief) of Reinwald O'Connor Marrack Hoskins & Playdon, on the briefs, Honolulu, for Petitioner-Proponent–Appellant Hanno Soth.

Carroll S. Taylor, Kimo C. Leong, and Gregory W.K. Chee, on the briefs, Honolulu, for Respondent–Contestant–Appellee First Church of Christ Scientist, Honolulu.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ. and Circuit Judge SOONG, in place of KLEIN, J., recused.

Opinion of the Court by RAMIL, J.

We granted petitioner-proponent-appellant Hanno Soth's application for a writ of certiorari with respect to the Intermediate Court of Appeals' (ICA) decision in *In re Estate of Herbert*, No. 16291, slip op., 1997 WL 123563 (Ct.App.Haw. March 18, 1997).

It is apparent from the arguments of the parties and the ICA's decision that the bulk of our case law regarding the relevant law of wills is nearly a century old. We take this opportunity to clarify and affirm the antiquated body of the Hawai'i law of wills and the principles established therein. With particular regard to the instant case, we disagree with the ICA's legal reasoning regarding the scope of character evidence admissible to establish a disposition to exert undue influence over a testator or testatrix in the execution of a will, and we agree, in part, with the evidentiary concerns raised by Judge Simeon Acoba in his dissenting opinion.

Therefore, we affirm for different reasons.

## I. *FACTUAL BACKGROUND*

Carmen Corrine Herbert died on July 4, 1990, at approximately 85 years of age. The next day, on July 5, 1990, Hanno Soth, a 26–year–old Canadian citizen, filed a petition to probate Carmen's third and final will, dated December 20, 1989 (the "1989 Will"). A jury, however, denied probate of the 1989 Will on April 23, 1992, on the bases that Carmen lacked the requisite testamentary capacity for its execution, was mistaken about its con-

tents, and was unduly influenced in its execution.

The record on appeal reveals that Soth managed Carmen's financial affairs from December 1989 until the time of her death. For example, Carmen executed a general power of attorney in favor of Soth on December 18, 1989. Soth organized Carmen's bills on his computer, issued computerized checks to pay them, and was authorized to buy, sell, and withdraw funds and securities on her behalf. Soth sought legal advice for Carmen and assisted her in attending doctor visits and taking prescribed blood pressure medication, in addition to accepting her handwritten notes explaining her desire to stop taking her medication and acceding to those desires. Soth also drafted the 1989 Will for Carmen, was present when it was executed at the Kaimukī Branch of First Hawaiian Bank, and was named as the personal representative and residuary legatee of the 1989 Will, potentially receiving over $1.5 million dollars. Soth's July 5, 1990 petition to probate the 1989 Will invoked the immediate objection of respondent-contestant-appellee First Church of Christ Scientist, Honolulu (First Church), the residuary legatee of Carmen's second will, which was executed on September 8, 1988 (the "1988 Will").[1]

Jury trial commenced on March 30, 1992. In support of its objections to the 1989 Will, First Church adduced the testimony of several witnesses, including Betty Pettus, Richard Mirikitani, Esq., John Mickey, M.D., Linda Parker, Diane Chong, Lilian Ishikawa, Leland Kahawai, Audrey Simao, Eliott Loden, Esq., A. Peter Howell, Esq., Floye Adams, Celia Podorean, James Pearce, M.D., Allen Lum, David Von Hamm, Hazel Kraemer, Eileen Urquhart, and Hanno Soth.

First Church adduced evidence that, on approximately September 2 or 3, 1988, Mr. and Mrs. John and Floye Adams, Carmen's friends from First Church, took Carmen to Laniolu Convalescent Home in Waikīkī for a temporary visit, apparently because of a leg infection acquired in a golf cart accident. On September 6, 1988, Carmen was taken to see Dr. John Mickey at Straub Clinic and Hospital. Dr. Mickey diagnosed Carmen as having chronic non-healing leg ulcers and "organic brain syndrome, secondary to aging."[2] Two days later, on September 8, 1988, Carmen duly executed the 1988 Will at Laniolu, with First Church potentially receiving $1.5 million dollars as the sole residuary legatee.[3] On September 20, 1988, Carmen executed a general power of attorney in favor of Mr. Adams and Mr. James Pettus, equally.

Richard Mirikitani, Esq., Carmen's neighbor and friend, testified that, on October 17, 1989, he prepared for Carmen a revocation of the 1988 general power of attorney. However, he did not think that Carmen could understand a document such as the 1989 Will. He also testified that Carmen did not have sufficient mental capacity to know the nature and extent of her property, to know the natural objects of her bounty, or to formulate a rational scheme for distribution of her property. Betty Pettus, a long-time friend of Carmen, testified that, on the very morning of Carmen's death, Soth informed her that an attorney would be contacting her about Carmen's will. Pettus also testified that she did not believe that Carmen possessed the testamentary capacity to execute the 1989 will.

Linda Parker was Carmen's live-in housekeeper, who worked for Carmen for approximately eighteen months, ending on July 1, 1990, and who observed Carmen and Soth interact. Parker testified that Carmen's memory deteriorated throughout 1989, evidenced by Carmen frequently getting lost when traveling to familiar places, by Car-

1. Carmen's first will was executed on April 5, 1973 and named First Church of Christ Scientist, Honolulu and Shriners' Hospital for Crippled Children, a Colorado corporation, as equal one-half residuary legatees.

2. According to the testimony of Dr. Mickey, organic brain syndrome, or dementia, is a disorder that varies in degree from short-term memory deficit to advanced memory loss and cognitive disability. Dr. Mickey testified that Carmen was suffering from a short-term memory deficit. Dr. James Pearce also testified that Carmen was suffering from mild dementia.

3. Mr. Adams arranged for his attorney, Eliott Loden, to draft the 1988 Will, naming Mr. Adams as the personal representative and making cash bequests to six people, including Mr. Adams, Mrs. Adams, and Soth.

men's failure to recall her assets or her bequests when asked about them, and by her failure to remember what she had for lunch or what was in the morning paper. The only time that Parker vacationed away from Hawai'i and from Carmen was the last two weeks of December 1989, the time period within which the 1989 Will was executed. Parker also testified that, in her opinion, Soth was cunning, calculating, and secretive and that she did not trust him. According to Parker, Soth delivered a letter to her on June 1, 1990, explaining that Carmen was terminating her employment and giving her thirty-days notice. She finished her employment with Carmen three days before Carmen died. According to Parker, Soth spent the night, for the first time, at Carmen's home the night she died.

Although Soth eventually drafted the 1989 Will for Carmen, First Church also adduced evidence showing that Soth attempted to obtain legal advice from A. Peter Howell, Esq., regarding the drafting of a new will for a "wealthy elderly lady." First Church also adduced the testimony of Diane Chong, which showed that, on December 20, 1989, the day of the 1989 Will's execution, no one read or explained the contents of the 1989 Will to Carmen at First Hawaiian Bank before she signed it. After December 1989, Carmen appeared not to remember that she executed another will after the 1988 Will.

First Church further adduced evidence that Carmen was again diagnosed, in late January 1990, with "probable organic brain syndrome secondary to aging," after she suffered a concussion during a fall.[4] Further, on July 2, 1990, Dr. Mickey reported that Carmen had ceased taking her medicine and "[w]ould rather resort to Christian Science practice for her blood pressure[.]" Dr. Mickey wrote and also testified that he "believe[d Carmen was] competent to hand[le] her own affairs, despite her age-related memory syndrome[.]"

Consistent with its theory that Soth had an overarching motive or plan to "unduly influence" Carmen into executing the 1989 Will, First Church adduced evidence of Soth's character, including evidence surrounding his application to become the special administrator of Carmen's estate. In particular, First Church adduced evidence, of which the trial court took judicial notice, that Soth misrepresented his residency to the probate court in both his written and oral pleadings. The Immigration and Naturalization Service (INS) proceedings revealed that Soth was arrested for overstaying his six-month tourist visa one day before filing his application to become special administrator, in which he represented his "residency" as being Hawai'i. On November 6, 1990, the INS ordered Soth to depart the United States voluntarily, eleven days prior to the probate proceeding in which he was appointed special administrator of Carmen's estate. Soth, in turn, applied for another visa to return to the United States on the basis of his appointment. Finally, First Church adduced evidence that Soth intended to attend law school in the fall of 1990, even though he allegedly agreed to take care of Carmen upon Parker's leaving in early July. Soth communicated with Whittier College School of Law about his acceptance and the deadlines for tuition deposits. He also mailed the second tuition deposit payment the day after Carmen died.

In addition to testifying on direct examination during the contestant's case-in-chief and throughout his own case, Soth adduced the testimony of several witnesses in support of the validity of the 1989 Will, including Mary Bitterman, Dorothy Theaker, Jack Larson, Henry Rodriguez, Ruth Kerr, Michele Yamamoto, Jerry Breeden, Steve Bobko, and Robert Schulz, M.D.

Soth testified, for example, that he was, in fact, not in charge of insuring that Carmen took her medication and that he was not controlling Carmen's financial affairs but, instead, protecting them. Soth explained that he sought legal advice for Carmen only at

---

4. On January 25, 1990, Dr. James Pearce described Carmen's "mental status" as follows:
 Judgement, orientation, memory, and other higher cognitive functions are basically intact except for some evidence of bilateral frontal lobe release signs of mild degree and mild impairment in cognitive function. This is perhaps consistent with age but perhaps just a bit more. There is no evidence of aphasia or sleep disorder.

her request, drafted the 1989 Will at Carmen's request and direction, and read over the 1989 Will with Carmen, prior to arriving at First Hawaiian, to insure that it contained what she wanted. He explained that he told no one of the 1989 Will and its contents out of respect for Carmen's privacy. Soth further testified that Carmen was an independent woman who made her own decisions. Soth also adduced evidence of Carmen's tax returns showing that Carmen had never donated to the First Church of Honolulu, although she donated minimally to the "mother" church in Boston, Massachusetts.

Soth adduced the testimony of Dr. Schulz, who had treated Carmen over a couple of years for a number of skin lesions and cancers. Schulz testified that he removed a lesion from Carmen's neck on December 13, 1988. Schulz explained that he went through an informed consent document with Carmen and that he had no doubts about her ability to comprehend what was being said to her. Schulz also testified that he saw Carmen on March 19, 1990 and that he "did not have concerns that she couldn't hand[le] her own affairs."

Regarding his application to be appointed as special administrator of Carmen's estate, Soth refused to acknowledge in open court that he, in fact, misrepresented his residency to the probate court. He, instead, explained that his INS problems resulted from a simple mistake in an application for a student visa and were resolved easily.[5] Regarding his law school applications for fall 1990 and his communications with Whittier, Soth also explained that he was not certain about attending law school that fall, but, nevertheless, that Carmen was aware of his interest of attending law school prior to her death.

Soth presented the testimony of Dorothy Theaker, Carmen's long-time friend. Theaker testified that Carmen did not like her housekeeper, Linda Parker, and that she wanted Parker to leave. According to Theaker, Carmen was extremely upset by the extensive renovations done to her home while she was in Laniolu. Theaker explained that Carmen "would forget occasionally, but she was competent." She also explained that Carmen knew her assets, but often did not let people know about them because Carmen thought people were interested in her money. Theaker testified that Soth had impeccable character, that he was not deceitful, dishonest, or cunning, and that Soth was the only person whom Carmen really trusted.

Mary Bitterman, Carmen's neighbor and friend, testified that Carmen's mental acuteness did not change after her stay in Laniolu. She stated that Carmen was spirited and joyful and that Carmen had her "wits about her." Similarly, Jack Larson, a friend of both Soth and Carmen, testified that he saw no difference in Carmen's mental acuity after she left Laniolu. He testified that Carmen took very good care of her home and yard. He also explained that Soth moved into Carmen's home to lower the insurance premiums on Carmen's home, which Soth corroborated.

Ruth Kerr, Carmen's long-time friend, testified that Carmen was a very private person and never spoke of her Christian Science religious practice. Kerr explained that Soth was very thoughtful and kind to Carmen, that she never saw Soth influence Carmen in any regard, and that there was not a romantic relationship between Soth and Carmen. She further testified that Carmen had sufficient mental capacity to know the nature and extent of her property, to know the objects of her bounty, and to formulate a rational scheme of distribution for her assets and property. In fact, Carmen talked with Kerr about her assets, such as her Rosalie apartment.

Michele Yamamoto, Soth's girlfriend of four years, testified that Soth and Michele's relationship was apparent and that Carmen knew and approved of their relationship. Yamamoto testified that she even visited Carmen at Laniolu. Yamamoto also testified that she did not know that Soth drafted the

---

5. It was at this time that the trial court took judicial notice of the fact that Soth's application for appointment as special administrator represented his residency as being Hawai'i and that the probate court was never informed, prior to Soth's appointment, that he was not a United States citizen, that he was not a Hawai'i resident, and that he was ordered to depart the United States on November 5, 1990.

1989 Will for Carmen. Jerry Breeden, Carmen's neighbor and friend, testified that he often talked to Carmen about her childhood and her real estate. He expressed concern over people attempting to influence Carmen to sell her home for less than it was worth. Breeden thought that Carmen was very independent and that she was "mentally right there." Breeden talked to her the night before she died. Although Carmen looked very tired that night, he stated that she still had the mental capacity to execute a will. Breeden also testified that Soth was a very honest, straightforward individual and that Carmen never expressed that Soth was attempting to persuade her to do anything. According to Breeden, even though rumors circulated about Soth and Carmen engaging in a romantic relationship, they were not romantic, but more like grandmother and grandson.

Steve Bobko, a financial investor with Dean Witter Reynolds Inc., testified that he managed accounts for Carmen and that he didn't suspect any difference in her mental acuity after she returned from Laniolu. He testified that she had the mental capacity to manage her business affairs and that she had the mental capacity to execute a will.

After further testimony, First Church adduced in rebuttal the testimony of Allan Lum, the manager of the Waialae Country Club, who testified that he witnessed Soth and Carmen at the Country Club holding hands in an affectionate, "lovie-dovie," and non-platonic manner. He also testified that Carmen was not as mentally sharp after she left Laniolu. David Von Hamm, Carmen's neighbor and Soth's former friend, testified on rebuttal that, in the late summer or early fall of 1989, he had a conversation with Michele Yamamoto. According to Von Hamm, Yamamoto stated that she was very upset because Carmen was jealous of her and Soth's relationship and because she always had to hide her car so that Carmen did not

know when she was visiting Soth. Von Hamm testified that "she told me that Hanno told her that it was just a matter of time before they would get ... Carmen's house on the corner." Betty Pettus testified again and conceded that Carmen was not one who could be dominated or easily persuaded. However, she also stated that the 1989 Will did not represent Carmen's testamentary intentions.

Soth adduced the testimony of Michele Yamamoto on rebuttal. Yamamoto denied speaking to Von Hamm about Carmen or her house and, in fact, testified that she spoke to Von Hamm about Soth helping Mrs. Watanabe, another neighbor.

On April 20, 1992, First Church and Soth moved for directed verdicts, both of which were denied.[6] The case was submitted to the jury on April 21, 1992. On April 23, 1992, the jury denied admission of the 1989 Will into probate. Soth moved for judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial on May 4, 1992. The trial court denied Soth's motion and entered a final judgment on May 13, 1992. Soth timely appealed.

## II. *The Appellate Proceedings*

Soth argued that: (1) the verdict was not supported by sufficient or competent evidence; (2) the trial court erred in admitting evidence of events which occurred after Carmen Herbert's death, including evidence of Soth's (a) INS proceedings, (b) application to be appointed special administrator, (c) failure to notify the probate court of his foreign residence (by way of judicial notice), (d) communications with Whittier College School of Law, and (e) moving into Carmen's home without paying any rent to the estate; (3) the trial court erred in excluding the rebuttal testimony of Peter Kashiwa, his attorney during the INS proceedings; (4) the trial court erred in admitting character evidence unrelated to the will's validity; (5) the trial

---

**6.** First Church and the ICA apparently took issue with the failure of Soth's counsel to use the term "directed verdict;" however, Soth's counsel did state at the close of both cases and before closing argument that "the evidence is [in]sufficient to even permit *the case* to go to the jury." (Emphasis added.) Although using the term directed

verdict would have been preferable, Soth adequately preserved the issue of sufficiency of the evidence for appellate review. *See* Hawai'i Rules of Civil Procedure (HRCP) Rule 50(a); *Sheraton Hawaii Corp. v. Poston*, 51 Haw. 142, 148, 454 P.2d 369, 373 (1969).

court erred in admitting laypersons' testimony about Carmen's testamentary capacity without proper foundation; (6) the trial court erred in refusing to strike testimony regarding Soth's alleged unauthorized practice of law despite its prior motion in limine ruling; (7) the trial court erred in refusing to instruct the jury regarding the (a) presumption of testamentary capacity, (b) insufficient bases for a determination of testamentary capacity, (c) low mental capacity required for making a will, (d) insufficient basis for a determination of mistake, and (e) difference between influence and undue influence with regard to a will's execution; (8) the trial court erred by instructing the jury on mistake without sufficient evidence to support the instruction; and (9) the trial court erred by instructing the jury that there was no evidence to support Soth's allegations of a breach of attorney-client privilege.

On March 18, 1997, the ICA issued a final decision. In affirming the circuit court's judgment, the two-judge ICA majority held, in relevant part, that: (1) there was sufficient evidence to support each verdict; (2) the trial court did not abuse its discretion when it admitted into evidence nonexpert opinion testimony regarding Carmen's testamentary capacity; (3) the trial court did not err in admitting lay testimony regarding Soth's character prior to Carmen's death because it was relevant to his disposition to exert undue influence; (4) the trial court did not err in admitting evidence of events that occurred after Carmen's death regarding Soth's character because, again, it was relevant to his disposition to exert undue influence; (5) the trial court did not err when instructing the jury to disregard Soth's statement of violations of attorney-client privilege because it was not supported by the record; (6) the trial court did not err in refusing to give seven of Soth's requested jury instructions because the instructions, as given, were not prejudicially insufficient, erroneous, inconsistent, or misleading; and (7) the trial court did not abuse its discretion in refusing to

strike testimony, previously ordered excluded, regarding Soth's unauthorized practice of law.[7]

Judge Acoba dissented, first explaining that he disagreed with the majority's holding that an instruction on the presumption of testamentary capacity was not necessary. Second, he expressed great concern regarding the broad admission of character evidence under the SODR approach, *see infra* section III.A.4, and stated that he would remand the case on the ground that the "substitution of will" standard, as enunciated in *In re Estate of Heeb*, 26 Haw. 538, 540 (1922), was applicable and that the extensive amount of character evidence would not be admissible under *Heeb*. In this regard, Judge Acoba expressed the view that certain character evidence adduced about Soth may have prejudiced the jury and affected the verdict. Further, Judge Acoba believed that the verdicts were irreconcilably inconsistent. Because "the verdict c[ould ]not support the degree of confidence in the trial proceedings which would justify affirmance[,]" Judge Acoba would have vacated and remanded the case for a new trial.

On March 31, 1997, Soth filed an application for a writ of certiorari to this court. Soth urges reversal of the ICA's affirmance of the jury verdict because: (1) there was insufficient evidence to sustain a verdict of testamentary incapacity, undue influence, and/or mistake; and (2) Soth was overwhelmingly prejudiced by the trial court's errors in (a) admitting character or "disposition" evidence that occurred after Carmen Herbert's death, (b) admitting character or "disposition" evidence that occurred before Carmen Herbert's death but was without foundation; (c) instructing the jury that there was no evidence to support Soth's argument that his attorney-client privilege was violated; and (d) failing to instruct properly the jury on the (i) presumption of testamentary capacity, (ii) low requisite level of mental capacity to make

---

7. Soth does not contest that portion of the ICA's decision affirming the trial court's refusal to strike Eliott Loden's testimony regarding Soth's unauthorized practice of law. Nevertheless, we agree with the ICA that the trial court did not

abuse its discretion in refusing to strike the challenged testimony. *See State v. Rodrigues*, 67 Haw. 70, 74, 679 P.2d 615, 618, *cert. denied*, 469 U.S. 1078, 105 S.Ct. 580, 83 L.Ed.2d 691 (1984).

a will, and (iii) proper standard for undue influence.

## III. *DISCUSSION*

### A. *Sufficiency of the Evidence*

#### 1. *Standard of Review*

■■■ When a party seeks appellate reversal of a jury verdict based upon the claim of insufficient evidence, the party is, in effect, seeking appellate review of the trial court's denial of either a motion for directed verdict, a motion for JNOV, or a motion for a new trial. *See Sheraton Hawaii Corp.,* 51 Haw. at 147–48, 454 P.2d at 372–73.

It is well settled that a trial court's rulings on

> directed verdict or JNOV motions [are reviewed] *de novo.* Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.
>
> In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Carr v. Strode,* 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995).... Thus, "[w]here there is conflicting evidence, or there is insufficient evidence to make a one-way verdict proper, [JNOV] should not be awarded." *Id.* at 487, 904 P.2d at 501 (internal quotations and citations omitted).

*Lee v. Aiu,* 85 Hawai'i 19, 30–31, 936 P.2d 655, 666–67 (1997) (citation omitted).

> Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178; *see also Stahl v. Balsara,* 60 Haw.

144, 152, 587 P.2d 1210, 1215 (1978)....
Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178.

*Carr,* 79 Hawai'i at 488, 904 P.2d at 502. "A ... court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (citations and internal quotation marks omitted).

■■■ In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal. *See Steinberg v. Hoshijo,* 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998) (citation omitted). It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion. *See Krohnert v. Yacht Systems Hawaii, Inc.,* 4 Haw.App. 190, 197, 664 P.2d 738, 743 (1983).

#### 2. *There Was Substantial Evidence to Support the Jury Verdict that Carmen Herbert Lacked the Requisite Testamentary Capacity to Execute the 1989 Will.*

■■■ "The requirement that the testator [or testatrix] have mental capacity is an ancient one." Jesse Dukeminier and Stanley M. Johanson, *Wills, Trusts, and Estates* 147 (1995) (brackets added). This requirement emanates from two important and apparently contrasting principles: (1) "that a will should be given effect only if it represents the testator's true desires" and (2) "that the law requires mental capacity to protect the decedent's family." *Id.; see also In re Estate of Christian,* 65 Haw. 394, 401, 652 P.2d 1137, 1142 (1982).

■■■ A testator or testatrix is presumed to possess the requisite mental capacity to execute a will. *See In re Estate of*

*Lopez*, 25 Haw. 197, 199 (1919); *In re Estate of Coleman*, 1 Haw.App. 136, 139, 615 P.2d 760, 762 (1980); *see also In re Bakke's Will*, 160 Minn. 56, 199 N.W. 438 (1924). Testamentary capacity has been defined as the ability to know: (1) the nature and extent of the testator or testatrix's estate; (2) the identity of the beneficiaries and their relationship, whether by blood or other circumstances, to the testator or testatrix (*i.e.*, the objects of his or her bounty); (3) the disposition that the testator or testatrix is making; and (4) how these elements relate so as to form a rational and orderly plan for the disposition of the testator or testatrix's estate. *See* 1 *Page on the Law of Wills* § 12.21, at 606–09, 614–15 (William J. Bowe and Douglas H. Parker, eds., 1960) (*Page on Wills*); *Wills, Trusts, and Estates, supra*, at 149; *see also Estate of Adams*, 234 N.W.2d 125, 127 (Iowa 1975); *Evans v. Liston*, 116 Ariz. 218, 568 P.2d 1116, 1117 (Ariz.Ct.App. 1977); *cf. Estate of Kesler*, 702 P.2d 86, 88 (Utah 1985) ("The classic test of general testamentary capacity has three elements: to make a will, one must be able to (1) identify the natural object of one's bounty and recognize one's relationship to them, (2) recall the nature and extent of one's property, and (3) dispose of one's property understandingly, according to a plan formed in one's mind."). A party, who has standing to challenge the validity of a will, may contest the will based upon a lack of the requisite testamentary capacity. *See* Thomas E. Atkinson, *Handbook of the Law of Wills and Other Principles of Succession Including Intestacy and Administration of Decedents' Estates* § 99, at 521 (2d ed. 1953) (*Atkinson on Wills*).[8] The contestant of a will bears the burden of proving by a preponderance of the evidence that the testator or testatrix lacked the requisite testamentary capacity. *See* Hawai'i Revised Statues (HRS) § 560:3–407 (1993).

▮ Through the testimony of Richard Mirikitani, Betty Pettus, and Linda Parker, First Church adduced evidence showing that Carmen did not have the mental capacity in December 1989 to know the nature and extent of her estate, to know the objects of her

bounty, to know the disposition she was making, or to formulate a rational plan for the disposition of her estate. Although not conclusive on the issue of testamentary capacity, First Church also adduced, for example, evidence that Carmen was diagnosed with "organic brain syndrome secondary to aging" in September 1988 and January 1990, as well as evidence that, throughout 1989, Carmen would frequently get lost when traveling to familiar places, fail to recall her assets when asked about them, and fail to remember what she had for lunch or what was in the morning paper. In contrast, Soth adduced through the testimony of Dr. Schulz, Dorothy Theaker, Ruth Kerr, Jerry Breeden and Steve Bobko, that Carmen, indeed, possessed the requisite testamentary capacity to execute the 1989 Will.

In addition to the factual section *supra*, the foregoing demonstrates that there was conflicting evidence presented to the jury on whether Carmen possessed the requisite testamentary capacity to execute the 1989 Will. Further, the evidence presented by First Church was credible and of sufficient quality and probative value to enable a person of reasonable caution to conclude that Carmen lacked the requisite testamentary capacity to execute the 1989 Will. Therefore, the probate court did not err in denying Soth's motions for a directed verdict and for JNOV on this issue. As shown above, the record also shows that the jury's verdict, concluding that Carmen lacked the requisite testamentary capacity to execute the 1989 Will, was supported by substantial evidence and not against the manifest weight of the evidence. Thus, the probate court did not abuse its discretion in denying Soth's motion for a new trial.

3. *There Was Substantial Evidence to Support the Jury Verdict that Carmen Herbert Was Mistaken about the Contents of the 1989 Will.*

▮ Although there is a strong presumption that an able-bodied testator or testatrix knew the contents of his or her will, a will may be denied probate if he or she was

---

**8.** Generally, a beneficiary of a previous will, whose bequest has been reduced by a subsequent

will, has standing to contest the subsequent will. *See Atkinson on Wills, supra*, § 99, at 521.

ignorant of its contents. *Atkinson on Wills, supra,* § 58, at 273; 1 *Page on Wills, supra,* § 13.4, at 666; *see also In re Will of Ely,* 2 Haw. 649, 651 (1863) (affirming admission of will into probate because record revealed substantial evidence that testator had knowledge of its contents even though it was not read to testator at time of execution). The mere execution of a will creates the presumption that the testator or testatrix knew the contents of the will. *Atkinson on Wills, supra,* § 58, at 275–76; *see also In re Estate of Lopez,* 25 Haw. 197, 199 (1919); *Estate of Coleman,* 1 Haw.App. at 139, 615 P.2d at 762; *Will of Ely,* 2 Haw. at 651.

> The fact that the will was read by, or to, the testator is *strong* evidence that he had knowledge of the contents. It is not conclusive, however, and particularly when it was not read, there may be a denial of probate on the ground that the testator was mistaken as to its contents.

*Atkinson on Wills, supra,* § 58, at 276 (emphasis added); *see also* 1 *Page on Wills, supra,* § 13.4, at 667.[9]

▇ Here, First Church adduced evidence showing that the 1989 Will was not read to Carmen at the time of its execution at First Hawaiian Bank. After December 1989, Carmen appeared not to remember that she had executed another will after the 1988 Will. Soth, contrastingly, testified that Carmen requested and instructed him to write the 1989 Will and that he read over the 1989 Will with Carmen before its execution. Soth testified that he remembered the First Hawaiian Bank employee, Diane Chong, slowly paging through the 1989 Will, apparently permitting Carmen to read the will prior to execution, even though Chong testified to the contrary and Soth conceded that

---

9. It is well settled that the contestant bears the burden of proving by a preponderance of the evidence that the testator or testatrix was mistaken about the contents of the challenged will. *See Will of Ely,* 2 Haw. at 651; HRS § 560:3–407 (1993). When conflicting evidence is adduced, the weight and credibility of that evidence is for the fact-finder to consider and determine. *See generally* 1 *Page on Wills, supra,* § 5.9, at 184 and § 13.4, at 667.

10. The record reveals a question of whether the burden of proof shifts from the contestant to the proponent after the contestant puts forth suffi-

he could not remember whether Carmen had her reading glasses on at the time. Soth also testified that he never revealed the contents of the 1989 Will to another person out of respect for Carmen's privacy.

As was the case regarding Carmen's testamentary capacity, the foregoing demonstrates that conflicting evidence was presented to the jury on the question of mistake. Nevertheless, the evidence presented by First Church was credible and of sufficient quality and probative value to enable a person of reasonable caution to conclude that Carmen was mistaken about the contents of the 1989 Will. Therefore, the probate court did not err in denying Soth's motions for a directed verdict and for JNOV. Similarly, the record shows that the jury verdict was supported by substantial evidence and was not against the manifest weight of the evidence. Thus, the probate court did not abuse its discretion in denying Soth's motion for a new trial.

4. *There Was Substantial Evidence to Support the Jury Verdict that Carmen Herbert Was Unduly Influenced when She Executed the 1989 Will.*

▇ A will may also be denied probate if it is determined that the will's execution is the result of undue influence. 1 *Page on Wills, supra,* § 15.3, at 720, and § 15.11, at 740; *see also In re Will of Naoiwi,* 14 Haw. 43, 45 (1902) (affirming the denial of probate of a will because there was sufficient evidence to support a jury verdict of undue influence). "Undue influence [however] is one of the most bothersome concepts in all of law. It cannot be precisely defined." *Wills, Trusts, and Estates, supra,* at 160.[10]

---

cient evidence of undue influence. The plain language of HRS § 560:3–407 provides that "[c]ontestants of a will have the burden of establishing ... undue influence, [and u]nless the burden of proof is changed by other provisions of law, parties have the ultimate burden of persuasion as to matters with respect to which they have the initial burden of proof." However, the legislative history to Section 560:3-407 provides:

> 15. Section 560:3-407 is amended to make clear that the burden of proof in contested cases may shift in the manner prescribed by the rules of evidence.

■ "It is sometimes said that the elements of undue influence are, susceptibility of [the] testator [or testatrix], opportunity for the exertion of undue influence, disposition to exert undue influence, and the result, in the will, of such undue influence." 1 *Page on Wills, supra,* § 15.5, at 722 (footnotes omitted) (brackets added); *see also In re Estate of Kamesar,* 81 Wis.2d 151, 259 N.W.2d 733, 737 (1977) (The elements of undue influence "are: (1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result."); *In re Estate of Anders,* 88 S.D. 631, 226 N.W.2d 170, 173–74 (1975). The so-called "SODR" factors have evolved to aid courts in determining whether to deny probate of a will based upon the theory of undue influence. Well established Hawai'i case law involving undue influence has impliedly recognized and adopted the "SODR" factors. *See In re Will of Charles Notley,* 15 Haw. 435, 440–41 (1904); *In re Estate of Afong,* 26 Haw. 147, 152–54 (1921).

■ This court stated that undue influence

may be shown by circumstantial evidence. *Mental weakness* on the part of the testator and *general control over him,* and *desire and opportunity to control* him in the *disposition of his property* by will may be shown—*but only in so far as it tends to show that undue influence was in fact operative at the time of the execution,* and in such cases the indirect evidence must be of a clear and convincing character; indeed, it is said that it must be not merely consistent with the theory of undue influence, but inconsistent with a contrary theory. Mere suspicion and conjecture are not enough.

*Will of Notley,* 15 Haw. at 440–41 (emphases added) (citations omitted). "Mental weakness on the part of the testator" is, in effect, the susceptibility of the testator to be unduly influenced. "[O]pportunity to control him in the disposition" is the opportunity to exert undue influence. "[D]esire ... to control him in the disposition" is the disposition to exert undue influence. Finally, *Will of Notley*'s focus upon the disposition of the property equals the factor of the "result of the

Reason for change: The Commentary to the model UPC notes that the UPC language sets forth "what is believed to be a fairly standard approach to questions concerning burdens of going forward with evidence in will contest cases." However, the model UPC language does not on its face allow for the shifting of the burden of proof upon proof of certain facts. For example, once a contestant establishes that a testator lacked capacity, the proponent of a will which was thereafter executed has the burden of proving that the will was written during a lucid interval. *See In re Coleman,* 1 Haw.App. 136, 615 P.2d 760 (1980); *Estate of Lopez,* 25 Haw. 197 (1919). In addition, once it is established that the proponent of the will in a confidential relationship with the testator actively procured the execution of the will and unnaturally benefitted thereunder, the burden shifts to the proponent to prove a lack of undue influence. *See Estate of Gelonese,* 36 Cal.App.3d 854, 111 Cal.Rptr. 833, 838 (1974); *cf. Teixeira v. Teixeira,* 40 Haw. 631 (1955) ("The burden of proof where there is a transaction between those standing in a fiduciary relationship is upon the person who held the position of superiority and influence by virtue of the relationship.") at 637[.] Under the rules of evidence, the presumption of undue influence is one which changes the burden of proof since it is a presumption adopted to implement a public policy. See Hawai'i Rules of Evidence, Rule.304(a); *Estate of Gelonese, supra.*

Your Committee's additional language is intended to make clear that the burden of proof in will contest cases is subject to change upon proof of requisite facts in the same manner as it is subject to change in other areas of law under the rules of evidence.

Sen. Conf. Comm. Rep. No. 77, in 1996 Senate Journal at 776 (brackets and footnote added). HRE Rule 304 provides in pertinent part:

Presumptions imposing burden of proof. (a) General Rule. A presumption established to implement a public policy other than, or in addition to, facilitating the determination of the particular action in which the presumption is applied imposes on the party against whom it is directed the burden of proof.

Therefore, under the current version of HRS § 560:3-407, the burden of proof shifts. However, the instant trial occurred in 1992, when the former version of HRS § 560:3-407 was operative and when the burden of proof did not shift. *See Montoya v. Torres,* 113 N.M. 105, 823 P.2d 905, 911 (1991) (citing *In re Estate of Foster,* 102 N.M. 707, 699 P.2d 638, 641 (N.M.Ct.App.), *cert. denied* 102 N.M. 734, 700 P.2d 197 (1985) (burden of persuasion does not shift but remains with party alleging undue influence)); *In re Estate of Novak,* 235 Neb. 939, 458 N.W.2d 221, 226 (1990) (recognizing a Nebraska statute, adapted from the Uniform Probate Code, that provides that the burden of proving undue influence remains with the contestant(s) of the will).

disposition." [11] Therefore, Hawai'i has already recognized and impliedly adopted the "SODR" factors in determining whether the exertion of undue influence resulted in the execution of a challenged will.

Hawai'i law, however, expressly requires an additional consideration: "that the undue influence must be proved to have operated as a present constraint at the very time of making the will[.]" *Id.* at 440; *see also* 1 *Page on Wills, supra,* § 15.10, at 737 ("Undue influence does not render a will invalid unless it operates at the time that the will is made and causes its execution."). Ultimately, "[t]o sustain a claim of undue influence[,] it must appear that the influence exercised amounted to fraud or coercion destroying free agency, or the substitution of another's will for that of the testator [or testatrix] so that the product is not that of the testator [or testatrix]." *Estate of Heeb,* 26 Haw. at 540 (holding motion for new trial properly granted and citing to *Will of Notley* as "a splendid exposition of the law of wills in respect to their invalidity as a result of undue influence").

It is well settled that a trial court may direct a verdict in favor of the proponent of a will if the evidence offered to prove undue influence is insufficient as a matter of law. *See In re Will of Kalua,* 23 Haw. 149, 155 (1916) (affirming directed verdict in favor of proponent because the only evidence offered was that the attorney who drafted the will was also a member and trustee of a church organization which was named as a beneficiary in the will). However, a trial court should not direct the verdict in favor of the proponent when evidence of all four of the SODR factors is presented. Where the evidence is conflicting, most jurisdictions submit the case to the jury and instruct the jury that the burden of persuasion is upon the contestant to establish by a preponder-

ance of the evidence the existence of undue influence. *See* 1 *Page on Wills, supra,* § 29.81, at 591.

Here, conflicting evidence on all four of the SODR factors was presented to the jury with respect to the execution of Carmen's 1989 Will. First Church adduced evidence of Carmen's susceptibility to be unduly influenced by showing that, in September 1988, Carmen was diagnosed as having short-term memory deficit or organic brain syndrome. Addressing both susceptibility and opportunity, First Church adduced evidence showing that Carmen and Soth were in a romantic relationship and that Soth, who only knew Carmen for approximately two and one-half years, drafted the 1989 Will for Carmen, drove her to First Hawaiian Bank where it was executed, and was present during its execution. First Church also adduced evidence of Soth's opportunity to exert undue influence over Carmen by showing that, two days prior to the execution of the 1989 Will, Soth gained control over all of Carmen's business and financial affairs through a general power of attorney. With respect to Soth's disposition to exert undue influence over Carmen, First Church adduced evidence of Soth's character,[12] through evidence of lay opinion testimony and specific instances of conduct, from which the trier of fact could infer a plan to "get Carmen's house on the corner," obtain her money for law school, and gain control of her estate in order to gain control over her money. Regarding the coveted result, Soth was named as the residuary legatee, potentially receiving over $1.5 million dollars.

In contrast, Soth adduced evidence that Carmen was independent and was not easily influenced. Soth adduced evidence that the 1988 Will, naming First Church as the residuary legatee, did not represent her wishes and that she wanted to revoke that will.

---

11. *See* Ray D. Madoff, *Unmasking Undue Influence,* 81 Minn.L.Rev. 571, 590 (1997) ("[A] natural disposition is one which provides for the testator's heirs at law."); *cf. Carpenter v. Horace Mann Life Ins. Co.,* 21 Ark.App. 112, 730 S.W.2d 502, 507 (1943) ("Where the provisions of a will are unjust, unreasonable and unnatural, doing violence to the natural instinct of the heart, to the dictates of parental affection, to natural justice, to solemn promises, and to moral duty, such

unexplained inequality is entitled to great influence in considering the question of testamentary capacity and undue influence." (Citation omitted)).

12. The admissibility of character evidence with regard to disposition is addressed *infra,* section II.B.

Soth also testified that Carmen wanted to leave the majority of her estate to him and that the 1989 Will represented those wishes. Soth countered the allegations of a romantic relationship with evidence that Carmen and Soth shared a grandmother/grandson-type relationship.

In light of the foregoing, the evidence presented to the jury was—once again—conflicting. Therefore, the probate court correctly denied Soth's motions for a directed verdict and for JNOV. Further, the record reveals a substantial amount of evidence supporting the jury's conclusion that Carmen was unduly influenced to execute the 1989 Will. This conclusion was not against the manifest weight of the evidence. Therefore, the probate court did not abuse its discretion in denying Soth's motion for a new trial.

5. *The Affirmative Verdicts of a Lack of Testamentary Capacity, Mistake, and Undue Influence Are Not Irreconcilably Inconsistent and Do Not Constitute Reversible Error.*

 Finally, although neither raised nor briefed on appeal, Judge Acoba wrote in his dissent that the affirmative verdicts on all three issues of contest were inconsistent.

 From the standpoint of appellate review,

[a] conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory.... When faced with a claim that the verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to dismiss the jury's verdict and remand the case for a new trial.

*Carr,* 79 Hawai'i at 489, 904 P.2d at 503 (quotation marks and citations omitted); *see also Craft v. Peebles,* 78 Hawai'i 287, 307, 893 P.2d 138, 158 (1995). Regarding this area, *Page on Wills* has provided the following:

It was once thought that mistake, misrepresentation, fraud and undue influence could only occur with respect to a testator of sound mind, meaning one possessed of the necessary mental capacity to make a will. This view undoubtedly developed as the corollary position, once thought to be the prevailing rule, that an unsound mind, one lacking mental capacity, could not be the subject of mistake, misrepresentation, fraud or undue influence. Whether this position was scientifically accurate or not it is somewhat obvious as a legal matter that if the testator lacks the mental capacity required by the legal standard of testamentary capacity, the will is totally invalid for that reason alone and the existence of fraud or one of the other matters listed above is immaterial. But the corollary, which was stated first, does not logically follow. Evidence of fraud, undue influence, or mistake should not be taken as negating or running counter to evidence showing a lack of mental capacity. *The establishment of mistake, fraud, etc., should not presuppose a mentally competent testator.*

Almost all modern cases now recognize the close relationship and overlapping nature of the doctrines of mental capacity, mistake, misrepresentation, fraud and undue influence. Of the persons having mental capacity, some have exceedingly strong and vigorous minds and dominating personalities and are little, if at all, susceptible of being overcome by undue influence, whereas others have weak minds and timid nature and are highly susceptible of giving way to undue pressure or of being tricked through fraud.

1 *Page on Wills, supra,* § 13.1, at 661–62 (internal footnotes omitted) (emphasis added).

Here, the three issues of contest were presented to the jury, in the alternative, on a special verdict form. A thorough review of the record reveals that it is reasonably conceivable for the jury to have found that Carmen lacked the requisite testamentary capacity to execute the 1989 Will, that she was mistaken about its contents, and that she was unduly influenced in its execution. Therefore, although the issues of contest were submitted to the jury in the alternative, the

**460**

affirmative verdicts on all three issues are not irreconcilably inconsistent and will not be reversed.

### B. Admissibility of Character Evidence Regarding the Disposition to Exert Undue Influence.

#### 1. Standard of Review

■■■■ [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. *Kealoha v. County of Hawaii*, 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied*, 74 Haw. 650, 847 P.2d 263 (1993). Where the evidentiary ruling at issue concerns admissibility based upon relevance, under ... [HRE] Rules 401 and 402, the proper standard of appellate review is the right/wrong standard.... *State v. Kupihea*, 80 Hawai‘i 307, 314, 909 P.2d 1122, 1129 (1996) (some brackets in original and some added). "Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion." *Walsh v. Chan*, 80 Hawai‘i 212, 215, 908 P.2d 1198, 1201 (1995).... "HRE 404 represents a particularized application of the principle of HRE 403 (*see* Commentary to HRE 404), and we will employ the same abuse of discretion standard of review." *State v. Alston*, 75 Haw. 517, 538, 865 P.2d 157, 168 (1994) (brackets and internal quotation marks omitted).... *State v. Arceo*, 84 Hawai‘i 1, 11, 928 P.2d 843, 853 (1996) (brackets in original) (some citations omitted).

#### 2. Character Evidence Is Generally Admissible to Establish Undue Influence.

■■■■ The general rule is that "[e]vidence which tends to prove or disprove the subordination of the will of [the] testator to others must, except in extreme cases, take a very wide range[.]" 3 *Page on the Law of Wills* § 29.78, at 577 (William J. Bowe and Douglas H. Parker, eds., 1961); *see also* 3 *Page on Wills, supra,* § 29.77, at 131 (Supp. 1998). In *Estate of Afong*, 26 Haw. at 154, this court stated that:

> In cases involving the contest of wills upon the ground of undue influence the courts generally permit an unusually wide range of inquiry.... In this case [the trial court] permitted the presentation to the jury [to reflect] as accurately as possible the characters involved in the family tragedy, their relations to each other and the ultimate result.

(Brackets added.) However,

> [t]here is no doubt ... "that the *undue influence must be proved to have operated as a present constraint at the very time of making the will* [.]" ... And yet direct evidence of such influence at the precise time of execution is not indispensable. That may be shown by circumstantial evidence ... *but only in so far as it tends to show that undue influence was in fact operative at the time of the execution* ....

*Will of Notley*, 15 Haw. at 440–41 (emphases added); *see also Estate of Heeb*, 26 Haw. at 538.

■■■■ From an evidentiary standpoint, character evidence of disposition to exert undue influence at the time of the will's execution may be admissible under Hawai‘i Rules of Evidence (HRE) Rule 404(b), which provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

Citing the Advisory Committee of the federal rules of evidence, the commentary to HRE Rule 404 further states that this "rule does not deal with the situation where the character of the person is itself an element of a

claim or defense...." *See also* 2 J. Weinstein & M. Berger, *Weinstein's Evidence &* 404[03], at 404–17 (1991). Indeed, HRE Rule 405 provides:

Methods of proving character. (a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) Specific instances of conduct. *In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of the person's conduct.*

(Emphasis added.) Thus, character evidence of the disposition to exert undue influence over the testator or testatrix at the time of a will's execution may be substantively admissible.

The circuit court, however, must make a threshold determination under HRE Rule 402 [13] regarding whether the proffered evidence is indeed relevant to one's disposition to exert undue influence over the testator or testatrix at the time of the execution of the will. Then, the circuit court must determine whether the proffered evidence, although relevant, should be excluded under HRE Rule 403, because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Accordingly, the great latitude afforded in the introduction of evidence in a case of this kind is qualified. Under Hawai'i law, character evidence regarding one's disposition to exert undue influence is admissible in a will contest where the contestant has alleged undue influence, only insofar as it tends to show that undue influence was in fact operative at the time of the will's execution, *i.e.,* that undue influence was exerted over the testa-

tor/testatrix at the execution of and resulted in the challenged will.

3. *Lay Opinion Testimony Is Admissible to Establish Undue Influence, Insofar as It Tends to Prove Undue Influence at Time of the Will's Execution.*

■ In this regard, *Page on Wills* states:

If a witness first testifies to facts which tend to show undue influence, is it proper to ask him for his opinion as to whether or not testator was induced to make his will by the exercise of undue influence? Upon this question the courts have divided. Some courts have held that, under such circumstances, the witness may give his opinion. Other courts have held that the witness cannot give his opinion. This result has been reached, in part at least, on the theory that this question is for the jury, and that such a question asks the witness, in effect, to tell the jury what verdict he thinks they should render.

Even if the witness may give his opinion, it must be a reasonably clear and definite one as to the existence and effect of undue influence.

The opinion of a witness as to the existence of undue influence is inadmissible unless he first states the facts upon which he bases such opinion....

The opinion of the witness is inadmissible if relating to facts so remote from the execution of the will as to have no value as evidence of undue influence at the time of such execution.

3 *Page on Wills, supra,* § 29.123, at 666–67 (footnotes omitted). *Page on Wills* also states that evidence of the conduct of beneficiaries and heirs

is admissible if it tends to prove or disprove the existence of undue influence.

Evidence ... that a beneficiary ... was a man of good character ... is admissible.

If it is found that the beneficiary burned letters and papers which had belonged to the testator, the jury may infer that such letters and papers contained evidence

---

**13.** HRE Rule 402 provides that only relevant evidence is admissible, *i.e.,* "evidence having any tendency to make the existence of any fact that is

of consequence to the determination of the action more probable or less probable than it would be without the evidence."

which would have been unfavorable to the beneficiary. Evidence that the beneficiary removed papers from testator's safety deposit box soon after testator's death is admissible.

Such evidence is not admissible if it does not tend to prove or disprove undue influence. *Evidence as to the general conduct of the person by whom it is alleged that undue influence was exerted, such as the fact that such a person, who was a lawyer, had been guilty of professional misconduct toward other clients, or the fact that one of the beneficiaries had consulted with testator's attorney a considerable period of time before the will was executed, or that one of the beneficiaries had not employed counsel to represent him at contest, or that certain persons were present at the probate of the will, or that the beneficiaries were members of a certain society, or that the beneficiaries had been guilty of misstatements of fact which did not involve the interest of the testator,* or that the person who was claimed to have exerted undue influence was insane, or that the woman, by whom undue influence is alleged to have been exerted on her daughter-in-law to procure a will in favor of the latter's husband, was stingy, or that the beneficiary had sought to study hypnotism so as to hypnotize testator and thus to secure a will in his favor, in the absence of evidence tending to show that he actually studied hypnotism or made use thereof, or that the husband of testatrix was a drunkard, *is inadmissible.*

3 *Page on Wills, supra,* § 29.196, at 681–82 (emphases added). Accordingly, character evidence in the form of lay opinion testimony and specific instances of conduct is admissible if it tends to prove the exertion of undue influence at the time of the will's execution.

a. *The Circuit Court Erred in Admitting Certain Lay Opinion Testimony regarding Soth, Who Was Accused of Exerting Undue Influence over Carmen Herbert in the Execution of Her 1989 Will.*

██ Soth argues that character or disposition evidence was not an issue in the instant case and that the trial court's broad admission of character or disposition evidence unfairly prejudiced the jury against him, in violation of HRE Rule 403. As stated *supra,* evidence of character or disposition to exert undue influence over the testatrix or testator at the time of the execution of a will is admissible if it is relevant and not unfairly prejudicial.

Soth challenges the following question posed by First Church to Ms. Parker: "How would you characterize Hanno Soth?" In response, Ms. Parker testified that, in her opinion, Soth was cunning, calculating, and secretive and that she did not trust him. Soth argues that Parker's response was without foundation, remotely related to the direct issue of whether undue influence was operative at the will's execution, and given solely for the purpose of proving that Soth acted in conformity with her view of his character. We agree.

Although First Church elicited from Parker that she worked for Carmen Herbert for eighteen months, up until three days before Carmen died, and that she observed Carmen and Soth together on several occasions, directly before and after the execution of the 1989 Will, Parker's generalized opinion of Soth's character is not directly relevant to whether Soth exerted undue influence over Carmen at the time of the 1989 Will's execution. As stated above, the range of admissible character of evidence may be broad, but it is nevertheless limited to the exertion of undue influence over the testator or testatrix at the time of the execution of the will. General conduct without specific reference to the exertion of undue influence over the testator or testatrix at the time of the execution of the will is inadmissible. *See* 3 *Page on Wills, supra,* § 29.196, at 681–82. Therefore, the probate court erred by admitting Parker's opinion of Soth's character in this regard.

██ "[T]he trial court's error in admitting the [lay opinion testimony] into evidence 'is not a basis for reversal absent substantial resulting prejudice to the rights of a party.'" *Lau v. Allied Wholesale, Inc.,* 82 Hawai'i 428, 438, 922 P.2d 1041, 1051 (1996) (citing Commentary to HRE Rule 103 (quoting *Trask v. Kam,* 44 Haw. 10, 22, 352 P.2d 320, 326 (1959))) (internal quotation

marks omitted) (brackets added); *see also Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 272, 660 P.2d 1309, 1314 (1983); *Kekua v. Kaiser Found. Hosp.*, 61 Haw. 208, 218, 601 P.2d 364, 371 (1979). In light of the substantial evidence presented regarding Soth's disposition to exert undue influence, including, as noted above, his intent to "get Carmen's house on the corner," to obtain her money for law school, and to gain control over her estate, we hold that the probate court's error did not substantially prejudice the rights of Soth and that the error was harmless.[14]

b. *The Trial Court Did Not Err or Abuse Its Discretion in Admitting Evidence of Events that Occurred after Carmen Herbert' s Death.*

Soth argues that absolute temporal limitations should be recognized regarding events that occur after the death of the testator or testatrix. Soth argues that events occurring after Carmen's death are *per se* inadmissible on questions of both testamentary capacity and undue influence. Soth cites 3 *Page on Wills*, § 29.78, at 580 and § 29.127 at 679, in support of this proposition. However,

[a]s much of the life of the testator as is necessary to understand his relations to the beneficiaries under the will, and to the natural objects of his bounty, and the details of the relations between the testator and the beneficiary near the time at which the will was executed, are admissible. Evidence which tends to show that the beneficiary acquired control over testator's mind before the will was made, and retained such control beyond the period at which the will was executed, is admissible, *even if such evidence relates to a remote period of time.*

Evidence of facts which occur so long before the execution of the will that they do not throw light upon the relation of testator to the beneficiary, or to the natural objects of his bounty, at the time of the execution, is inadmissible. . . .

*If evidence is inadmissible because of remoteness, it is remoteness with reference to its tendency to prove undue influence, rather than remoteness with reference to time alone. Remoteness with reference to time alone goes to the weight rather than to the admissibility of the evidence.*

*Questions of remoteness are, to a large extent, in the discretion of the trial court, there being no arbitrary rule as to the time over which the inquiry may range.*

Evidence of facts which occur after testator's death is *ordinarily* inadmissible on the issue of undue influence.

Wide as the range of admissibility of evidence, evidence which does not tend to establish undue influence is not admissible.

3 *Page on Wills, supra*, § 29.78, at 577–80 (footnotes omitted) (emphases added).

Thus, the admission of evidence of events regarding undue influence is not gauged simply by when the testator or testatrix has died. Evidence of such events must be evaluated "with reference to its tendency to prove undue influence" in the very making of the will. *Id.* The fact that "[e]vidence of facts which occur after [the] testator's death is *ordinarily* inadmissible on the issue of undue influence" does not *per se* preclude evidence that tends to show that a will is the result of undue influence.

Consistent with its theory that Soth had an overarching plan and motive to "unduly influence" Carmen into executing the 1989 Will, First Church argued for admission of evidence regarding Soth's application to become special administrator of Carmen's estate and Soth's immigration and citizenship status.[15] First Church argued that Soth intentionally misrepresented his residence as Hawai'i, despite knowing prior to filing his application that he was illegally residing in the United States and that he had to depart the United States voluntarily for overstaying his six-month tourist visa, which expired in June 1988. Soth, however, argued that he did not intentionally misrepresent his resi-

---

14. Furthermore, Soth presented evidence showing that his character was "impeccable," that he was thoughtful and kind, and that he was neither deceitful, dishonest, nor cunning.

15. HRE Rule 405 provides for admission of specific instances of conduct when "character or a trait of character of a person is an essential element of a charge, claim, or defense[.]"

dence to the probate court. Soth explained that he inadvertently overstayed his tourist visa, because he had mistakenly assumed that a student visa application, filed after June 1988, was granted. Soth also argued that, because the probate code did not define the term resident, his residing in Hawaiʻi for two years made him a resident.[16]

First Church specifically argued for admission of evidence regarding the execution of an order to show cause, notice of hearing, and warrant for Soth's arrest, filed and served on September 11, 1990. The warrant provided in pertinent part:

4. You were ... admitted as a visitor for pleasure (B–2), and authorized to remain in the United States for a period not to exceed six (6) months;

5. You have remained in the United States beyond June 1988, without authority of the United States Immigration & Naturalization Service;

AND on the basis of the foregoing allegations, it is charged that you are subject to deportation pursuant to the following provision(s) of law:

Section 241 (a)(2), of the Immigration and Nationality Act, in that, after admission as a nonimmigrant under Section 101(a)(15) of said act you have remained in the United States for longer than you are permitted.

The following day, on September 12, 1990, Soth filed his application to be appointed special administrator, representing that he was "a resident of Hawaii and [wa]s eligible to be Special Administrator under Section[s] 560:3–203(g), 3–615(b) and 4–101(2)." However, on November 5, 1990, an Immigration Judge ordered that "in lieu of deportation respondent be granted voluntary departure

without expense to the Government on or before December 5, 1990...." The hearing on Soth's application to be appointed special administrator was held on November 16, 1990. With regard to residency, Soth's counsel argued the following:

Qualified—I would refer Your Honor to— The only place qualification appears in the Hawaii Probate Code is 3–601[ [17]] which says "qualified shall be 18 years old," and we used to say "and a resident of the State." And even that was changed this year by act 17. So even a non-resident can serve as a personal representative— therefore, [Soth] is qualified under the terms of our statute.

(Footnote added.)

Soth, however, did not apply to be special administrator as a nonresident soon to be deported. Soth submitted to the probate court that he was a resident. First Church moved to disqualify Soth on November 27, 1991. After the December 3, 1991 hearing, the circuit court rendered its decision denying the motion without prejudice on April 20, 1992, the day before the case was submitted to the jury.

Aside from the fact that Soth knew, when he filed his application and appeared before the probate court, that he was illegally residing in the United States and the State of Hawaiʻi, Soth did not disclose to the probate court that he was ordered to depart the United States voluntarily by December 5, 1990. These misrepresentations to the probate court tend to show that Soth wanted to insure that he would be named as special administrator and gain control over Carmen's estate. Although approximately one year after Carmen's execution of the 1989

16. The legislative history to HRS § 560:3–601 originally provided that "[a] requirement of residency for an individual personal representative is a continuation of existing Hawaii law." Sen. Conf. Comm. Rep. No. 24–76, in 1976 Senate Journal at 858. The prior residence qualifications under the Hawaiʻi Probate Code provided only that an "administrator appointed by any court of the State ... shall be [ ] an individual *residing in the State* ...." *See* HRS § 531–9 (1968) (emphasis added). The 1990 amendment including nonresidents was added "to ease the burden on nonresidents in trying to find resi-

dents who are willing to serve as personal representatives, by allowing nonresidents to serve if they submit themselves to the jurisdiction of the court." Hse. Stand. Comm. Rep. No. 457–90, in 1990 House Journal at 1018.

17. HRS § 560:3–601 (*effective* April 17, 1990) provided, in pertinent part, "that a nonresident may be eligible to serve as a personal representative in this State if the nonresident submits to the jurisdiction of the Hawaii courts[.]"

Will,[18] evidence of Soth's desire to gain control over Carmen's estate is corroborative of and tends to show that Soth had an overarching plan and motive to exert undue influence over Carmen at the time of 1989 Will's execution.

■ Alternatively, First Church argued that evidence regarding Soth's INS proceedings was necessary to impeach Soth when he refused to acknowledge that he, not his attorney, misrepresented his residence to the probate court. *See Kekua,* 61 Haw. at 221, 601 P.2d at 373 ("[T]he extent of cross-examination is a matter largely within the discretion of the trial court and will not be the subject of reversal unless clearly prejudicial to the complaining party."); *see also Cozine v. Hawaiian Catamaran, Ltd.,* 49 Haw. 77, 101–02, 412 P.2d 669, 685 (1966) (reversing trial court's decision to preclude cross-examination of plaintiff regarding misstatements made in an affidavit filed in the same case); *State v. Tomas,* 84 Hawai'i 253, 257–58, 933 P.2d 90, 94–95 (App.1997) (allowing, under HRE Rule 802.1(1)(B), substantive use of prior inconsistent statements that have been signed, adopted or approved by the declarant). Because the evidence tended to show that Soth exerted undue influence over Carmen in her execution of the 1989 Will and because the evidence was also used for impeachment purposes, the trial court did not err or abuse its discretion in admitting evidence of Soth's INS proceedings.

■ Consistent with its theory that Soth had an overarching plan and motive to gain control over Carmen's assets and "unduly influence" her into leaving Soth over $1.5 million dollars, First Church also successfully argued for the admission of evidence regarding Soth's communications with Whittier College School of Law. First Church argued that Soth was in need of Carmen's money to attend law school in the fall. Accordingly, evidence was adduced at trial that, although Soth had allegedly intended to care for Carmen after Parker was fired in June/July 1990, Soth had paid his first tuition deposit to Whittier for the fall 1990 semester. Soth sent via Federal Express a second tuition deposit the day after Carmen died. Soth, however, testified and adduced evidence that he was not sure of his intent to attend law school in the fall of 1990. First Church further presented evidence that Soth communicated with Whittier, after Carmen's death, about the possibility of postponing his attendance for one semester (because of his newly-appointed duties as special administrator). Because this evidence was relevant, *i.e.,* was corroborative of his gaining access to Carmen's money, tending to show that Soth exercised undue influence over Carmen's execution of the 1989 Will, the trial court did not err or abuse its discretion in admitting evidence of Soth's communications with Whittier.

■ First Church, finally, adduced evidence that Soth had the intent to "get ... Carmen's house on the corner" in the fall of 1989, a few months prior to the execution of the 1989 Will. First Church argued that Soth's living in Carmen's home without paying rent to her estate corroborated his intent to "get" the house and control her estate and assets for his personal gain. Soth countered with evidence that he lived in the vacant house only to lower the insurance premiums.

Although conflicting, this evidence was relevant to and tended to show that Soth exercised undue influence over Carmen's execution of the 1989 Will. Therefore, the trial court did not err in admitting evidence of Soth's living in her home after her death without paying rent to the estate.

18. *See Hopkins v. McClure,* 45 So.2d 656, 657 (Fla.1950):

When undue influence of one person over another is being investigated a broad latitude should be allowed in the presentation of evidence of the relationship between the parties both before and after the particular time around which the inquiry centers. Acts and circumstances tending to show undue influence even far removed in time should be considered. Remoteness goes to the weight rather than the admissibility of the evidence, unless the time is so far removed as to deprive the circumstances of any evidentiary value. One year, as in a case of this kind, is not such a period of time as would render the evidence without probative value.

c. *The Trial Court Did Not Err in Taking Judicial Notice of Soth's Representation of His Residency in His Application to Be Appointed Special Administrator of Carmen Herbert's Estate.*

 The trial court took judicial notice of the fact that Soth represented to the probate court that he was a resident of Hawai'i, when, in fact, he was a Canadian citizen. HRE Rule 201 [19] governs the taking of judicial notice of adjudicative facts by the trial court, which should be reviewed by an appellate court under the right/wrong standard. " 'Adjudicative' facts 'are the kind of facts that are ordinarily decided by the trier of fact; for example, who did what to whom, when, where, how, and why.' " *State v. Kwak*, 80 Hawai'i 297, 306, 909 P.2d 1112, 1121 (1995) (citing *State v. Puaoi*, 78 Hawai'i 185, 190, 891 P.2d 272, 278 (1995)); *see also* A. Bowman, *Hawai'i Rules of Evidence Manual* 26–27 (1990).

> A fact is a proper subject for judicial notice if it is common knowledge or is easily verifiable. *Almeida v. Correa*, 51 Haw. 594, 465 P.2d 564 (1970).... As we see it, the purpose of the judicial notice rule, and it would appear to be a wholesome one, is to eliminate the necessity of taking the time of the court and jury to make formal proof of a fact which cannot be disputed. *Van Welden v. Ramsay's, Inc.*, 199 Kan. 417, 430 P.2d 298 (1967).

*State v. Mayo*, 1 Haw.App. 644, 646, 623 P.2d 898, 899 (1981).

 Here, First Church orally moved the trial court to take judicial notice of Soth's representation of his residency as being the State of Hawai'i in his application to be appointed special administrator of Carmen's estate. The record reveals that Soth would not acknowledge in open court that he misrepresented his residency as being the State of Hawai'i. Soth did not object to the trial court's taking judicial notice, but instead objected, in the form of a pretrial motion in limine, to the admission of all evidence regarding Soth's INS proceedings and the probate proceedings.

Considering that Soth's representation of his residency as Hawai'i was a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned[,]" *i.e.*, simply looking to the pleadings in the underlying probate proceeding, and considering that First Church requested that the court take judicial notice and supplied the court with the necessary information, the trial court did not err in taking judicial notice of Soth's representation of his residency.

### 4. *The Trial Court Did Not Abuse Its Discretion in Denying Admission of Soth's "Rebuttal" Evidence.*

 In response to First Church raising the issue of Soth's INS proceedings in a pretrial motion to have Soth removed as special administrator, Soth orally moved on March 27, 1992 to adduce the "rebuttal" testimony of his attorney, Peter Kashiwa, Esq., who had represented Soth during the INS proceedings. Although Soth characterized this testimony as "rebuttal" testimony because it would be used to rebut evidence adduced during First Church's case-in-chief, this testimony was not rebuttal evidence. Soth intended to present this testimony in his own case-in-chief. Because neither Soth nor First Church named Kashiwa as a witness on their pretrial statements, settlement conference statements, or final naming of witness lists, the circuit court denied Soth's motions to present Kashiwa and/or to exclude the evidence altogether. Under HRE

---

19. HRE Rule 201 provides in relevant part:

> (b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) *capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.*
>
> (c) When discretionary. A court may take judicial notice, whether requested or not.

> (d) When mandatory. *A court shall take judicial notice if requested by a party and supplied with the necessary information.*
>
> ....
>
> (g) Instructing jury. In a civil proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

(Emphases added.)

Rule 403, a trial judge must balance the probative effect of relevant evidence against its possible prejudicial effect, and the trial judge's determination on that balance will not be disturbed in the absence of an abuse of discretion. Considering Soth's failure to name Kashiwa or to act with any diligence, we cannot conclude that the circuit court abused its discretion in refusing to permit this witness to testify.

### C. *Jury Instructions*

#### 1. *Standard of Review*

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*Tabieros*, 85 Hawai'i at 350, 944 P.2d at 1293 (citations omitted). Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews *de novo*. *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 504, 880 P.2d 169, 179 (1994). However, it is well recognized that

" '[i]t is prejudicial error for the court to refuse to give an instruction relevant under the evidence which correctly states the law unless the point is adequately and fully covered by other instructions given by the court.'" *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 52, 919 P.2d 294, 314 (1996) (quoting *Agee v. Ka-*

*hului Trucking & Storage, Inc.,* 67 Haw. 365, 369, 688 P.2d 256, 259 (1984)). . . .

Correlatively, " '[j]ury instructions . . . must be considered as a whole. Moreover, a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given.' " *Montalvo[ v. Lapez],* 77 Hawai'i [282,] 286, 884 P.2d [345,] 349 [ (1994) ] (quoting *Pioneer Mill,* 64 Haw. at 180, 637 P.2d at 1140 (ellipsis points in original)). . . .

Thus, the line demarcating sufficient from cumulative instructions is a fine one:

The function served by jury instructions is to inform the jury of the law applicable to the current case. The boundaries of the trial judge's discretion in performing this function are defined by the obligation to give sufficient instructions and the opposing imperative against cumulative instructions. However, if any policy is to be preferred, it is that of allowing adequate and thorough instructions to be given, if they can be given without undue prejudice or confusion. . . .

*Tittle v. Hurlbutt,* 53 Haw. 526, 530–31, 497 P.2d 1354, 1357 (1972) (citations, brackets, and internal quotation marks omitted).

*Tabieros,* 85 Hawai'i at 371–72, 944 P.2d at 1314–15 (some citations omitted) (brackets in original).

#### 2. *The Trial Court Correctly Instructed the Jury.*

On appeal before the ICA, Soth challenged the trial court's refusal to give his proposed jury instructions Nos. 1, 2, 5, 8, 10, 16, and 20.[20] In his application for a writ of certiora-

---

20. Soth's proposed jury instructions included in relevant part:

PETITIONER'S INSTRUCTION NO. 1
 The presumption of law is in favor of testamentary capacity, and one who insists on the contrary has the burden of proving by a preponderance of the evidence that the testatrix (Carmen C. Herbert[) ], was incompetent on December 20, 1989, and that her will of that date was the product of undue influence.
PETITIONER'S INSTRUCTION NO. 2
 Testimony that the testatrix, Carmen Herbert, was sick, forgetful, unable to manage her

business, or at times appeared to be of unsound mind, or did not remember where her car or house was, do not provide a sufficient basis for an opinion that she lack[ed] testamentary capacity when she signed her will on December 20, 1989.
 . . . .
PETITIONER'S INSTRUCTION NO. 5
 Mere suspicion, surmise, conjecture or speculation is not enough to prove lack of testamentary capacity or undue influence or mistake.
 . . . .

ri, Soth added to his challenge the trial court's refusal to give his proposed instructions Nos. 3 and 4. Soth's challenge regarding instructions Nos. 3 and 4 are not properly before this court.

The trial court instructed the jury, in pertinent part, as follows:

In this case Proponent Hanno Soth petitions this Court to admit to probate the will dated December 20, 1989, of decedent Carmen Corinne Herbert. Contestant First Church objects to the petition on three grounds, namely, one, the deceased did not have testamentary capacity when she executed the will on December 20, 1989;

Or, two, the deceased was under the undue influence of the Proponent when she executed the will on December 20, 1989;

Or, three, the deceased was mistaken as to the nature or content of the will which she signed on December 20, 1989.

*The burden is upon the contestant to prove these allegations by a preponderance of the evidence.*

The issue of the validity of the will of September 8, 1988 is not for you to decide but you are to consider all of the evidence to determine the question of the validity or invalidity of the will of December 20, 1989.

First Church alleges that Carmen Herbert did not have the testamentary capacity to sign a will on December 20, 1989. First Church must establish by a prepon-

derance of the evidence that Mrs. Herbert lacked the necessary capacity by showing that she was lacking in at least one of the following.

*One, the ability to understand that she was signing a will; two, the ability to understand and know the nature and extent of her property; three, the ability to know the natural objects of her bounty; and, four, the ability to formulate a rational plan for the distribution of her property after she died.*

*To sustain the claim of undue influence it must be proved by a preponderance of the evidence that the influence exercised amounted to a fraud or coercion, destroying free agency or the substitution of another's will for that of the testator so that the product is not that of the testator.*

*First Church alleges that Carmen Herbert was mistaken as to the nature or content of the will which she signed on December 20, 1989. First Church must prove this allegation by a preponderance of the evidence.*

(Emphases added.)

■ As a threshold matter, every correct statement of law does not equal an appropriate jury instruction in every case. Although the majority of Soth's proposed jury instructions represent correct statements of law, in the context of various legal decisions based upon a specific set of facts, the majority, if

PETITIONER'S INSTRUCTION NO. 8
The mental capacity requisite for making a will is very low; and the right of testamentary disposition may be exercised by a person of very moderate mental capacity; or of slight mental capacity.
The ability to transact business is not the test of testamentary capacity. Less mental capacity is required for the testatrix, Carmen Herbert, to make a will than to carry on business transactions or ordinary business affairs, manage her estate, or enter into a contract, deed or other legal instrument or make a gift.
. . . .

PETITIONER'S INSTRUCTION NO. 10
The essential requirement is that the testatrix, Carmen Herbert, know the contents of her will; if this fact appears, the fact that she could not read or understand the language in which the will was written does not defeat the will.
. . . .

PETITIONER'S INSTRUCTION NO. 16
Influence is not undue influence unless a person through power of the mind of the testatrix, Carmen Herbert, makes her desire conform to his own so that the will not conform to her wishes but to the person exercising the undue influence.
. . . .

PETITIONER'S INSTRUCTION NO. 20
In determining whether Carmen Herbert's will was the result of undue influence, you may consider whether she was susceptible to undue influence, including testimony relating to her stubbornness and general strong mindedness, whether there is clear evidence that any person ever exercised dominance over her, whether there is any evidence that another person threatened to withhold affection or help if she did not change her will, and whether she made statements to disinterested persons consistent with the will.

not all, of Soth's proposed jury instructions were confusing and misleading and were encumbered with comments upon and references to facts that were presented at trial—something specifically prohibited by HRE Rule 1102 (1993).[21]

### a. The Trial Court Correctly Instructed the Jury on the Issue of Testamentary Capacity.

In particular, Soth argues that the trial court erred in refusing to give his proposed jury instructions Nos. 1, 2, 5, and 8, regarding testamentary capacity. In this regard, the ICA stated, in *Estate of Coleman*, 1 Haw.App. at 139, 615 P.2d at 762, the following:

> [T]he presumption of law is in favor of testamentary capacity and one who insists on the contrary has the burden of proof.
>
> The effect of the *[Estate of ]Lopez[*, 25 Haw. 197 (1919)]* presumption of testamentary capacity is to place the burden of proving lack of capacity on contestants.

This burden was correctly placed on the contestants in this case in four instructions given to the jury, the relevant portions of which are as follows: (1) "Contestants have the burden of proving by a preponderance of the evidence that the testatrix was incompetent on October 19, 1974 and that the October 19, 1974 will was the product of undue influence . . ."; (2) "Unsoundness of mind must be proved by the contestants by a preponderance of the evidence"; (3) "To find that Margaret Coleman was not of sound mind and memory at the time she executed the will of October 19, 1974, the evidence must preponderate in favor of unsoundness of mind"; and (4) "The burden of proving permanent and continuous type of unsoundness of mind is upon the contestants in this case." *A trial judge does not exceed the limits of his discretion by refusing a requested instruction which is substantially covered by other instructions given. Kometani v. Heath,* 50 Haw. 89, 431 P.2d 931 (1967). We hold that the trial court did not abuse its discre-

tion by refusing to separately instruct the jury on the presumption of competence. (Emphasis and brackets added.)

The trial court in the instant case, as in *Estate of Coleman,* instructed the jury that First Church must

> establish by a preponderance of the evidence that Mrs. Herbert lacked the necessary capacity by showing that she was lacking in at least one of the following.
>
> One, the ability to understand that she was signing a will; two, the ability to understand and know the nature and extent of her property; three, the ability to know the natural objects of her bounty; and, four, the ability to formulate a rational plan for the distribution of her property after she died.

Although the preferable instruction would include both the presumption of testamentary capacity and the burden of proof to be established by the contestant, the instruction given in this case accurately stated the law and adequately instructed the jury. As stated in *Estate of Coleman,* the jury can infer the presumption of testamentary capacity from the court's instruction that the contestant bears the burden of proving by a preponderance of the evidence that the testator/testatrix lacks testamentary capacity. Therefore, the trial court did not err in refusing to give Soth's proposed jury instructions Nos. 1, 2, 5, and 8, because the issue of testamentary capacity was substantially covered by the instruction given by the trial court.

### b. The Trial Court Correctly Instructed the Jury on the Issue of Mistake.

Soth argues that the trial court erred by instructing the jury on mistake when no evidence existed in the record to support an instruction on mistake. Soth also argues, however, that the trial court erred in refusing to give his proposed jury instructions Nos. 5 and 10, which address mistake.

First, as stated above, there was substantial evidence presented to the jury to support a verdict of mistake, let alone to support the giving of an instruction on mis-

---

21. HRE Rule 1102 provides: "**Jury Instructions; Comment on Evidence Prohibited.** The court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evidence. It shall also inform the jury that they are the exclusive judges of all questions of fact and the credibility of witnesses."

take. Second, the issue of mistake was adequately and substantially covered by the instruction on mistake, *i.e.*, that First Church bore the burden of proving by a preponderance of the evidence that Carmen was mistaken as to the nature and content of the 1989 Will, given by the trial court. Thus, the trial court did not err in refusing to give Soth's proposed jury instructions Nos. 5 and 10.

### c. *The Trial Court Correctly Instructed the Jury on the Issue of Undue Influence.*

 Soth argues that the trial court erred in refusing to give his proposed jury instructions Nos. 1, 5, 16, and 20, regarding undue influence. The trial court gave the following instruction on undue influence:

> To sustain the claim of undue influence it must be proved by a preponderance of the evidence that the influence exercised amounted to a fraud or coercion, destroying free agency or the substitution of another's will for that of the testator so that the product is not that of the testator.

This is a direct quotation from *Estate of Heeb*, 26 Haw. at 540, and is a correct statement of Hawai'i law on undue influence, explaining the ultimate determination for the trier of fact. Furthermore, Soth's proposed instructions Nos. 1, 5, 16, and 20 were both confusing (*e.g.*, addressing several issues at once or referring to "him" or "her" without any distinction) or misleading (*e.g.*, implying that no other evidence was presented but that mentioned in the instruction). Additionally, Soth's proposed instructions No. 5, 16, and 20 inappropriately commented on the facts actually presented at trial. Therefore, the trial court did not err in refusing to give Soth's proposed jury instructions Nos. 1, 5, 16, and 20, because the issue of undue influence was substantially and adequately covered by the instruction given by the trial court.

### 3. *The Trial Court Did Not Err by Instructing the Jury to Disregard Demonstrative Evidence Improperly Presented to the Jury During Soth's Closing Argument.*

 On January 31, 1991, the circuit court ruled "the attorney-client privilege . . . [un]available to prevent testimony from attorneys who had dealings either with Carmen Herbert or with persons acting on her behalf as to any communications relating to her estate planning and the facts and circumstances surrounding such communications." Therefore, Soth should not have adduced any evidence to the jury that A. Peter Howell, Esq., or Richard Mirikitani, Esq., the attorneys from whom he sought advice on behalf of Carmen, the "wealthy elderly lady," violated Carmen's attorney-client privilege.

However, during closing argument on April 21, 1992, Soth displayed a chart, entitled "The Lawyer Connection," before the jury. The chart provided that counsel for First Church persuaded Howell and Mirikitani to breach their duty to keep in confidence Soth's communication to them and that Howell breached Soth's confidence by disclosing his communications to Mrs. Adams, Mr. Taylor and Mr. Loden. At the request of First Church, the trial court instructed the jury as follows:

> [Y]ou must disregard any statement or argument of a lawyer which has no basis or support in the evidence. You are not bound by the lawyer's recollections or interpretations of the evidence.

> It's been called to my attention that [on behalf of] the Proponent, Mr. McGuigan, in his argument to you used a chart which is entitled The Lawyer Connections. I don't know whether or not you focused on its contents; however, there are certain matters on those—on the chart which you must disregard. The reason I am instructing you to disregard those matters is that those matters are not supported by the evidence.

> One of those matters indicates that Mr. Carroll Taylor persuaded Mr. Howell and Mr. Mirikitani to breach their duty to maintain confidential Mr. Soth's communications to them. This is not supported by the evidence and you must disregard that statement.

> The other matter that the chart indicates is that Mr. Peter Howell breached

Mr. Soth's confidential communications by disclosing them to Mrs. Adams, Mr. Loden, and Mr. Taylor. You must disregard that statement. That statement is not supported by the evidence.

(Brackets added.)

In this regard, HRE Rule 503 provides in pertinent part:

> (c) Who may claim the privilege. The privilege may be claimed by . . . the personal representative of a deceased client. . . .
>
> (d) Exceptions. There is no privilege under this rule:
>
> . . . .
>
> (3) Claimants through same deceased client. As to a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction. . . .

Here, First Church had standing to contest the 1989 Will, as the former residuary legatee under the 1988 Will. Soth is the residuary legatee of the 1989 Will. Both First Church and Soth "claim through the same deceased client[.]" Therefore, the circuit court correctly concluded that the attorney-client privilege did not apply to Carmen Herbert's privileged communications or to those made on her behalf. *See In re Estate of Morgan,* 225 Cal.App.2d 156, 37 Cal.Rptr. 160, 162, 170 (1964).

Furthermore, a thorough review of the record shows that there was no evidence presented to the jury that Soth's attorney-client privilege with either Howell or Mirikitani was breached or persuaded to be breached by Mr. Taylor, because Soth did not have attorney-client relationships with either Howell or Mirikitani. At no point did Soth present evidence that he sought legal advice from Howell or Mirikitani for himself. He only testified that he sought their advice on Carmen's behalf, and, as stated above, the circuit court ruled that Carmen's attorney-client privilege, or the estate's privilege, did not apply. Therefore, the trial court correctly instructed the jury to disregard Soth's "arguments" presented on the chart during closing argument because they were not supported by the evidence.

## IV. CONCLUSION

Based upon the foregoing, we affirm the probate court's final judgment denying probate of the 1989 Will for reasons different than those enunciated by the ICA in its decision of March 18, 1997.